United States Court of Appeals

FOR THE EIGHTH CIRCUIT

_____

No. 96-2172

_____

American Airlines, Inc.,                *
                                        *
        Plaintiff-Appellant,     *    Appeal from the United States
                                 *       District Court for the
    v.                           *       District of Minnesota
                                 *
KLM Royal Dutch Airlines,     *
Inc.,                            *
                                 *
        Defendant-Appellee.      *

_____

                Submitted:    December 13, 1996

                     Filed:     May 16, 1997
_____

    Before McMILLIAN and MAGILL, Circuit Judges, and WEBBER,[1] District
Judge.
_____

WEBBER, District Judge.


    American Airlines, Inc. (American), appeals from the order of the
United States District Court[2] granting summary judgment in favor of KLM
Royal Dutch Airlines, Inc. (KLM).  This court has jurisdiction under 28
U.S.C. § 1291.  We affirm.

_____

        [1]The Honorable E. Richard Webber, United States District Judge
for the Eastern District of Missouri, sitting by designation.

        [2]The Honorable David S. Doty, United States District Judge for
the District Court of Minnesota.

Prior to "deregulation" of the airline industry in 1978, airlines offered few fare classes to patrons and all airlines charged very similar rates for flights between the same origins and destinations.  Resulting competition arising after 1978, among airlines invited imaginative approaches to enhance revenues, including expanding class fares and rates. A concept known as "yield management," in the parlance of the industry, evolved.  Airlines developed yield management models, which sought to balance airline passenger capacity with demand for service in such a fashion that the most profitable fare class utilization can be maximized.

These yield management models are highly sophisticated and are quite expensive to develop.  The models involve analyzing and applying financial, logistical, and market data in an effort to maximize revenue, or yield, from a flight. The models utilize computer systems and elaborate mathematical equations, algorithms, and constants to simulate and forecast supply and demand.  There are many mathematical "elements" in the airline industry which are widely used and recognized in the public domain as significant factors in development of an effective yield management system. A company that can most effectively match demand with the most profitable class fares through its yield management system is assured a competitive advantage.

American, over a period of several years, dedicated substantial resources in the development of a unique yield management system known as DINAMO, an acronym for Dynamic Inventory and Maintenance Optimizer.  DINAMO contains five specific

individual elements.[3]  American maintains that its yield management system is unique and is entitled to protection as a trade secret.

Northwest Airlines Inc. (Northwest), a competitor of plaintiff, is aligned with KLM's respective business operations.  Disputes arising from employment of American personnel by Northwest resulted in a lawsuit originally initiated by Northwest against American.  The suit drew a counterclaim by American alleging, in part, that Northwest unlawfully misappropriated American's trade secrets relative to its yield management model.  That suit has been delayed pending resolution of the issues in this case.  In a similar fashion as in the Northwest litigation, American asserts that KLM has also misappropriated American's trade secrets by KLM's alleged receipt of American's trade secrets from Northwest.

In a deposition on August 2, 1993, Barry C. Smith, Vice President of American Airlines Decision Technologies, a division of American with primary responsibility for American's yield management system, testified as an expert witness for American.  Smith testified that the five "elements" (also referred to as concepts and factors) used by American, when combined in specific algorithms and formulae, comprise its yield management system DINAMO.  He testified that these five elements, while known at the conceptual level in the airline industry and in the public domain, have not been successfully mixed with algorithms and formulae except by American, and it is the combination and implementation of these elements by American in DINAMO that comprises a unique model which is not publicly available, and that therefore, American's unique model is a proprietary business trade secret entitled to

---

[3]  The five elements are contained in the parties briefs which are filed under seal.  Accordingly, the Court will not reveal the elements in this opinion.

- 3 -

protection under the Minnesota Uniform Trade Secrets Act (MUTSA), Minn. Stat. §§ 325C.01-325C.08.

American alleges that Northwest gained this proprietary material after Northwest hired many former American employees. As to the defendant in this case, KLM, American alleges that, as a result of the close business ties between Northwest and KLM, this proprietary material was then passed from Northwest to KLM. However, there is no allegation, nor any evidence, that documents outlining algorithms and formulae of American passed to KLM, nor that more than four of the five "elements" in DINAMO passed to KLM.

On November 19, 1993, American filed suit against KLM claiming misappropriations of trade secrets in violation of MUTSA. American alleged that KLM had received from Northwest trade secrets which had previously been unlawfully obtained from American. After American deposed KLM officials, KLM requested dismissal from the suit with prejudice. American, willing to dismiss the suit against KLM without prejudice, conceded, among other things, that KLM did not receive the detailed demand forecasting algorithms contained in the American documents which were allegedly misappropriated by Northwest; that, based on information allegedly received from Northwest, KLM could not develop a yield management system similar to American's; that KLM had no knowledge of how American's system worked and had not received from Northwest any documents describing the details of American's system; and that KLM changed its demand forecasting system in mid-1994, to one based upon a Boeing model. KLM would not agree to American's offer of dismissal without prejudice.

On May 5, 1995, KLM filed a motion for summary judgment. Before the motion for summary judgment was filed, Barry C. Smith had testified by deposition as an expert for American in the American-Northwest litigation. Smith testified that American's

trade secret was defined as the unique combination of the five "elements" and their implementation into algorithms, formulae and equations. After the motion for summary judgment was filed by KLM and it was known that KLM, at most, had only four of the five elements without knowledge of the algorithms or formulae, Smith, at a subsequent deposition, testified, "In my opinion, four elements, not including a specific alpha value, would constitute a trade secret."

In moving for summary judgment, KLM maintained that no genuine issue of material fact existed because American had manufactured the appearance of a dispute after the filing of KLM's motion for summary judgment by changing its testimony regarding the content of its alleged trade secret. KLM urged the district court to ignore Smith's later testimony because of the "sham exception" to the usual standards for summary judgment. The district court agreed, and determined that American's trade secret was "the combination and implementation of the five demand forecasting elements as incorporated in DINAMO through specific algorithms and formulae." The district court granted KLM summary judgment because the record conclusively established that KLM had not received any detailed algorithms or formulae describing how the five demand forecasting elements were to be incorporated, but had only received four of the general elements at the conceptual level without information as to how the concepts were to be combined. American maintains that the "sham exception" was inappropriately applied.

                                  II.
We review a grant of summary judgment de novo, applying the same standard as the district court. <u>Disesa v. St. Louis Community College.</u>, 79 F.3d 92, 94 (8th Cir. 1996). We will affirm the district court's decision if we find there is no genuine issue of material fact and the moving party is entitled to judgment as a

matter of law.  Id.  Fed.R.Civ.P. 56(c).  To successfully oppose a motion for summary judgment, the nonmoving party must present evidence of a genuine dispute of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  The nonmoving party must present admissible evidence from which a reasonable jury could return a verdict in its favor.  This requires more than a scintilla of evidence, and there must be specific facts set forth showing that there is a genuine issue for trial.  Davis v. Fleming Cos., Inc., 55 F.3d 1369, 1371 (8th Cir. 1995).

Parties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment.  RSBI Aerospace, Inc. v. Affiliated FM Ins. Co., 49 F.3d 399, 402 (8th Cir. 1995).  Courts must not deprive juries from their role in deciding genuine disputes of material fact, however, parties should not be permitted to fashion a dispute of material fact solely to impede a lawful exercise of granting a motion for summary judgment.  Wilson v. Westinghouse Elec. Corp., 838 F.2d 286, 289 (8th Cir. 1988).

> While district courts must exercise extreme care not to take genuine issues of fact away from juries, a party should not be allowed to create issues of credibility by contradicting his own earlier testimony.  Ambiguities and even conflicts in a deponent's testimony are generally matters for the jury to sort out, but a district court may grant summary judgment where a party's sudden and unexplained revision of testimony creates an issue of fact where none existed before.  Otherwise, any party could head off a summary judgment motion by supplanting previous depositions ad hoc with a new affidavit, and no case would ever be appropriate for summary judgment.

Wilson, 838 F.2d at 289 (internal citations and quotations omitted).  In Wilson, a terminated employee testified in a deposition that his supervisor said he was being terminated.  Then, after a motion for summary judgment was filed, the employee filed an affidavit stating that he was told his position was being

eliminated but he would remain on the company rolls until a new job could be found for him. A crucial question was whether his supervisor told him he was being terminated on a specific date, thus impacting the timeliness of the employee's action. In affirming that summary judgment, this Court concluded that the employee's revised account did not create a genuine issue of fact on which a jury would reasonably find that the limitations period in question was tolled because it was offered as a sham in direct contradiction to the employee's prior position simply as an attempt to counter a summary judgment motion.

This Court also affirmed granting of a motion for summary judgment upon application of the "sham exception" doctrine in Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361 (8th Cir 1983). There a person testified by deposition that he issued a check telling the payee not to deposit it until a certain date. Subsequently, the same person supplied an affidavit in which he attested that the issued check was to be returned to his place of business for payment and was not to be presented to the bank. This Court held that the issues injected by the subsequent affidavit were not genuine "because the circumstances do not suggest legitimate reasons for [the] filing of the inconsistent affidavit." Id. at 1365. This Court found the filing of the affidavits was "expressly for the purpose of opposing summary judgment . . . ." Id. In Camfield, we concluded,

> The very purpose of summary judgment under Rule 56 is to prevent the assertion of unfounded claims or the interposition of specious denials or sham defenses. If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own earlier testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact . . . The district courts should examine such issues with extreme care, and only in circumstances . . . where the conflicts between the deposition and affidavit raise only

sham issues should summary judgment be granted.  Under these circumstances it is incumbent upon the district court to articulate with care its reasons in resolving such conflicts.

Id. at 1365-1366.

There is no genuine disputed issue of a material fact in the record of this case.  During sworn testimony, American's expert testified that the specific combination of all five elements constituted a trade secret.  It is undisputed that KLM never received all five elements.  American's expert's subsequent testimony, after KLM's filing of a motion for summary judgment, that four of those same five elements at the conceptual level constituted a trade secret was offered solely to avoid summary judgment. After careful examination of American's expert's testimony we agree with the district court's conclusion that American attempted to manufacture a material issue of fact just to evade the impact of summary judgment by inexplicably changing his testimony.  Thus, the district court correctly disregarded the subsequent manufactured contradictory testimony of American and concluded that no factual issue for trial existed for the reason that KLM never received any trade secret of American's.

The judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.